NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

21-P-707                                        Appeals Court


    ROBERT HOLLUP  vs.  WORCESTER RETIREMENT BOARD & another.[1]


                        No. 21-P-707.

    Worcester.      September 14, 2022. – August 25, 2023.

             Present:  Rubin, Henry, & Walsh, JJ.


Contributory Retirement Appeal Board.  Retirement.  Municipal
    Corporations, Retirement board.  Division of Administrative
    Law Appeals.  Public Employment, Accidental disability
    retirement.  Administrative Law, Findings.



    Civil action commenced in the Superior Court Department on
January 15, 2020.

    The case was heard by Shannon Frison, J., on motions for
judgment on the pleadings.


    Michael Sacco for Worcester Retirement Board.
    David R. Marks, Assistant Attorney General, for
Contributory Retirement Appeal Board.
    Charles E. Berg for the plaintiff.


    RUBIN, J.  This case involves two important issues.  First,

we address the circumstances in which it is permissible for the

─────────────────────

    [1] Contributory Retirement Appeal Board.

Contributory Retirement Appeal Board (CRAB) to reverse factual findings made by a magistrate of the Division of Administrative Law Appeals (DALA) when CRAB reviews a decision made by that magistrate after hearing and evaluating the credibility of the testimony of live witnesses.  Second, we address CRAB's reading of Vest v. Contributory Retirement Appeal Bd., 41 Mass. App. Ct. 191 (1996), which it has construed to mean that an employee may not receive disability retirement benefits unless the employee establishes that he or she was permanently unable to perform the essential duties of his or her position as of the last day the employee actually performed those duties.  We conclude that that construction, which would eliminate the protection of disability retirement for myriad workers who suffer sequelae of, or a degenerative or progressive disease caused by, a work accident, is in error.

Introduction.  This case involves an application for accidental disability retirement benefits brought by Robert Hollup based on a psychiatric sequela to a closed-head injury he suffered when he fell off the back of a garbage truck on September 14, 2004.  The instant application indicated that the medical reason for the application was "depression caused by head injury."  A regional medical panel, defined by the statute as a "three member independent medical panel," G. L. c. 32, § 1, composed of three doctors, answered all three questions listed

on the Public Employee Retirement Administration Commission's
(PERAC) preprinted "Regional Medical Panel Certificate" in the
affirmative, thus finding that Hollup was "MENTALLY OR
PHYSICALLY INCAPABLE OF PERFORMING THE ESSENTIAL DUTIES OF HIS
OR HER JOB AS DESCRIBED IN THE CURRENT JOB DESCRIPTION," that
"SAID INCAPACITY [IS] LIKELY TO BE PERMANENT," and that "SAID
INCAPACITY [IS] SUCH AS MIGHT BE THE NATURAL AND PROXIMATE
RESULT OF THE PERSONAL INJURY SUSTAINED OR HAZARD UNDERGONE ON
ACCOUNT OF WHICH RETIREMENT IS CLAIMED,"[2] i.e., his falling off
the garbage truck on which he worked.  With respect to that
third question, relating to causation, the certificate correctly
stated:

> "If the acceleration of a pre-existing condition or injury
> is as a result of an accident or hazard undergone, in the
> performance of the applicant's duties, causation would be
> established.  However, if the disability is due to the
> natural progression of the pre-existing condition, or was
> not aggravated by the alleged injury sustained or hazard
> undergone, causation would not be established."

The narrative, written by one of the doctors on the regional

panel and concurred in by the other two, stated that

> "given the fact that his condition seemed to worsen
> markedly following the head injury, we would say that he
> meets criteria for aggravation of a preexisting condition
> standard, and that therefore said incapacity is such as
> might be the natural and proximate result of the personal

---

[2] The preprinted certificate states in a note, "When
constructing your response to the question of causality (#3) in
accidental disability narrative reports, your opinion must be
stated in terms of medical possibility and not in terms of
medical certainty."

injury sustained or hazard undergone on account of which retirement is claimed."

It further stated, "Our working diagnosis for [Hollup] is as follows:  1.  Major depressive disorder; 2.  Neurocognitive disorder due to traumatic brain injury; 3.  Personality disorder NOS."

Despite this, the Worcester retirement board (board) denied Hollup's application.[3]  He timely appealed to CRAB and CRAB assigned the appeal to DALA.  A hearing was conducted by a DALA magistrate, at which the magistrate not only considered the myriad medical reports reflecting Hollup's treatment, but also heard live testimony from Hollup.  Having heard Hollup testify, the DALA magistrate rejected the negative finding of a prior workers' compensation magistrate with respect to Hollup's credibility.  The DALA magistrate concluded that Hollup had met his burden of proving that he qualified for accidental disability retirement benefits as a result of the September 14, 2004, head injury.  As the regional medical panel did not lack pertinent medical facts, apply erroneous standards, or engage in

---

[3] Hollup previously brought another application for accidental disability retirement based on neurological consequences of the accident.  The medical panel there, see Murphy v. Contributory Retirement Appeal Bd., 463 Mass. 333, 335 (2012), concluded that Hollup was not incapable of performing his essential duties by virtue of any neurological deficit.  The doctors on that panel indicated that it was beyond the scope of their evaluation to comment on the question of "worsening psychiatric dysfunction" following the accident.

any procedural irregularities, the DALA magistrate weighed the panel's collective opinion heavily, noting that it was consistent with the opinions of six other doctors (Drs. Daniel Kirsch, Eric Smith, Mark Cutler, Lalit Savla, Michael Braverman, and Mikhail Vydrin).

On the board's appeal, CRAB purported to adopt with minor modifications the DALA magistrate's seventy-one findings of fact as its own. However, it disagreed with the magistrate's findings as to medical causation. CRAB purported to find that Hollup's psychiatric conditions were "continuous with his pre-existing conditions and not altered by the head injury of September 2004." As a second, independent ground for reversing the DALA decision, CRAB concluded that "Hollup must establish that he suffered from a matured and established psychiatric disability at the time he was last in active performance of his duties." In this, it purported to rely on Vest, 41 Mass. App. Ct. at 194. Hollup appealed to the Superior Court, which reversed the CRAB decision. See G. L. c. 30A, § 14. CRAB has now appealed to us.

Discussion. 1. CRAB's reversal of the DALA magistrate's findings of fact. The factual findings made by a DALA administrative magistrate are not immune from review and even reversal by CRAB. "Nonetheless, all subsidiary findings made by the magistrate are entitled to 'some deference' by CRAB, and

those findings that are based on credibility determinations by the magistrate are entitled to 'substantial deference.'" Murphy v. Contributory Retirement Appeal Bd., 463 Mass. 333, 336 (2012), quoting Vinal v. Contributory Retirement Appeal Bd., 13 Mass. App. Ct. 85, 101 (1982).  Where it rejects such findings, CRAB must provide "a considered articulation of the reasons underlying that rejection."  Vinal, supra at 102.  The deference required in review of factual findings "will permit [CRAB] to conduct a meaningful review of a [magistrate's] findings to determine whether they are significantly against the weight of the evidence, or . . . suspect in light of the 'consistency and inherent probability of testimony'" (citation omitted).  Id. at 101.  The requirement of an explanation "will help ensure that [CRAB] will carefully consider any decision to reject a [magistrate's] findings and that it will provide a reviewing court with an adequate explanation on which to determine whether that rejection was warranted."  Id.  This test must be considered against the fundamental rule rooted in due process that a reviewing body ordinarily may not reverse a credibility judgment made by the administrative or judicial officer who actually heard the testimony of the witness and found him or her

to be credible.[4]  "[I]t is inappropriate to ask [an appellate panel who has not heard the witness] to reverse a judge's findings involving credibility, since he saw the witnesses and we did not" (citation omitted).  Commonwealth v. Day, 387 Mass. 915, 919 (1983).  As we have explained, a determination of credibility made by one who actually heard a witness "is close to immune from reversal on appeal except on the most compelling of showings."  Johnston v. Johnston, 38 Mass. App. Ct. 531, 536 (1995).

CRAB articulated at great length its reasons for rejecting the conclusion of the regional medical panel and the DALA magistrate.  That articulation, required by our case law, allows us to examine CRAB's decision to reject the magistrate's findings.  In the end, we conclude that CRAB has provided no adequate basis for rejecting those findings or the conclusion of the magistrate that Hollup's depression was caused by an exacerbation by his head injury "of his pre-existing Attention Deficit Hyperactivity and mood disorders."

_____

[4] Cf. Fox v. Commissioner of Revenue, 51 Mass. App. Ct. 336, 343-344 (2001) (in matter in which "resolution of essential conflicting factual claims depend[ed] upon credibility determinations," Appellate Tax Board decision had to be vacated as matter of due process because no "member participating in the board's decision actually attended the board's hearing," and "the board could not evaluate the credibility of the witnesses without observing their demeanor when testifying").

At the end of the day, CRAB's conclusion was that Hollup's "psychiatric conditions were continuous with his pre-existing psychiatric conditions and not altered by the head injury." Critical to this conclusion were two subsidiary findings that are not supported by the record evidence. First, CRAB rejected the conclusion of the regional medical panel that Hollup had not received psychiatric treatment prior to the head injury. As the DALA magistrate noted, the unanimous regional medical panel had "all of the pertinent medical reports and diagnostic studies." They "acknowledge[d] the previous ADHD and anger management issues that became more symptomatic as a result of being aggravated when [Hollup] fell and hit his head on September 14, 2004." As to the panel doctors' assertion that Hollup did not receive psychiatric treatment prior to the accident, the DALA magistrate concluded that

> "the panel doctors, all of whom are psychiatrists, are absolutely correct. [Hollup] first saw Dr. Smith[, a psychiatrist,] at UMass in September 2004. He began treating with Dr. Kirsch[, a psychiatrist in the same clinic as Dr. Smith,] shortly thereafter. Admittedly, he participated in anger management sessions beginning in or about 1999. However, this cannot be categorized as psychiatric treatment[.] Delving deeper into his past, he was prescribed Ritalin and Celexa for his Attention Deficit Hyperactivity Disorder. However, the record does not reflect that these medications were prescribed by a licensed psychiatrist. Ergo, [Hollup] did not have psychiatric treatment until the aftermath of the September 14, 2004 accident."

CRAB's rejection of the medical panel's statement was based on extra-record evidence, particularly citation to a number of websites that were not in the administrative record, from which it concluded, apparently contrary to the conclusion of the actual psychiatrists on the regional medical panel, that the treatment for anger management issues amounted to "psychiatric treatment," so that the doctors' conclusion was in error.  See WebMD, Anger Management, https://www.webmd.com/mental-health/anger-management#1 [https://perma.cc/YK6U-X37T]; WebMD, Celexa - Uses, Side Effects, and More, https://www.webmd.com/drugs/2/drug-8603/celexa-oral/details [https://perma.cc/BVZ7-62AU].

It is impermissible for CRAB to rely on extra-record evidence such as this, see Brantley v. Hampden Div. of the Probate & Family Court Dep't, 457 Mass. 172, 185 n.17 (2010); Haley's Case, 356 Mass. 678, 681-682 (1970), and there is no basis in the record for second guessing the supported judgment of the doctors on the regional medical panel concerning the nature of Hollup's past treatment, of which they were aware.

The second critical basis for CRAB's conclusion was a citation to the reports of a single doctor, Dr. Michael Rater, who met Hollup on one brief occasion as the doctor who evaluated him in connection with a workers' compensation claim, and who concluded that Hollup's symptoms were due to overuse of

prescribed opioids.  CRAB asserted that Dr. Rater had concluded, as it did, that Hollup's psychiatric conditions "were continuous with his pre-existing psychiatric conditions and not altered by the head injury."

An examination of Dr. Rater's report, however, demonstrates that he did not address the symptoms of depression at all.  He did speak about conflict and irritability, but there is no indication in his report or anywhere in the administrative record that Hollup suffered from depression before the accident, although "major depressive disorder" was a primary finding of the regional medical panel.

Throughout its decision, CRAB also emphasized changes in the details described by Hollup when recounting the accident over time.  It certainly does appear that Hollup changed his description in some respects over time, making the events seem worse than he originally described them.  But the critical fact on which CRAB focused is Hollup's reporting of a loss of consciousness.  CRAB concluded that statement was false, and its decision states as a fact that "[i]nitially, the [hospital emergency department] report on the date of the accident indicated that Hollup denied loss of consciousness."

To be sure, the emergency department physician record does include a notation of "Øloc," which apparently means no loss of consciousness.  It is, however, not clear from the record that

this was reported by Hollup.  Most significantly, Hollup testified in person before the DALA magistrate that he had told every doctor he had met, including in the emergency department that day, that he had lost consciousness upon hitting his head. The magistrate, who heard the live testimony of Hollup, found him credible.  Because CRAB did not see the witness or hear Hollup testify, and because there is not the kind of evidence in the record that demonstrates by anything close to the requisite certainty that that credibility judgment was in error, see supra, CRAB was not free to conclude that Hollup was lying in reporting his loss of consciousness.

CRAB also asserts that the cause of any psychiatric disability was not the head injury.  It identifies a series of stressors that it says contributed to the depression, but the medical records do not indicate that these are causes of depression but that rather, Hollup suffered from "decompensation" in their presence.  CRAB finally says that "family and marital discord, financial stressors, medication overuse and opiate dependence, and lack of a structured life," which it suggests were causes of his depression, were withheld from the regional medical panel.  But the medical panel had access to all the medical reports that noted these issues, the significance of which has been described above.  To be sure, lack of a structured life caused by his inability to return to

work, may have played some role in Hollup's depression.  But the record does not support CRAB's conclusion that "Hollup has not met his burden to show that the head injury of September 2004 was the predominant cause of his psychiatric disability."[5]

2.  The significance of Vest.  As an alternative basis for rejecting the decision of the DALA magistrate, CRAB purported to rely on Vest, 41 Mass. App. Ct. 191, which CRAB says it has "extended" in its own prior decisions to "mean the employee must establish that he or she was permanently unable to perform the essential duties of his or her position as of the last day the employee actually performed those duties."

This is a serious misapplication of Vest.  In Vest, we concluded that because G. L. c. 32, § 7 (1) (1994 ed.), provided that "[a]ny member in service . . . who becomes totally and permanently incapacitated . . . by reason of a personal injury

---

[5] CRAB also concluded that neither the medical panel's certification nor the reports of Drs. Kirsch, Smith, Cutler, Savla, Braverman, and Vydrin could even support "a prima facie case for accidental disability retirement benefits," see Retirement Bd. of Revere v. Contributory Retirement Appeal Bd., 36 Mass. App. Ct. 99, 106 (1994), a conclusion that again relied on the erroneous premise that these reports were based on inaccurate statements from Hollup and lacked pertinent information regarding external stressors.  CRAB's conclusion was without merit.  To take the most obvious case, as the medical review panel had access to all the medical reports that noted these issues, its opinion certainly constitutes, in CRAB's own words, "sufficient evidence that, if unrebutted and believed, would allow a factfinder to conclude that [Hollup] suffered a permanent disability based on [a personal injury] sustained while performing [his work duties]."

sustained or a hazard undergone as a result of, and while in the performance of, his duties . . . shall be retired for accidental disability," where an employee leaves government service, in that case due to a nonmedical termination without having "an established disability," the employee, after that termination, i.e., while not a "member in service," may not claim an accidental disability retirement benefit.  Vest, 41 Mass. App. Ct. at 193-194.[6]

This has nothing to do with Hollup's case, as he was receiving workers' compensation benefits at the time he applied for accidental disability retirement, and retained under G. L. c. 32, § 14, all the rights of a "member in service."[7]  Indeed, the rule articulated by CRAB that requires a permanent inability to perform essential duties "as of the last day the employee

---

[6] The statutory language referring to becoming "totally and permanently incapacitated" has since been revised to refer to being "unable to perform the essential duties of [the individual's] job and that [sic] such inability is likely to be permanent."  G. L. c. 32, § 7 (1).  With respect to the holding in Vest, and its meaning, the change in the language of the statute is immaterial.

[7] General Laws c. 32, § 14 (1) (a), provides:

"Any employee who was a member in service at the time of sustaining an injury or undergoing a hazard on account of which he becomes entitled to payments under the provisions of chapter one hundred and fifty-two shall, during the period while he is receiving weekly payments for total incapacity . . . retain all the rights of a member in service . . . ."

actually performed those duties" is without support in the statute.  It would deny disability retirement benefits to someone who was injured on his last day at work, which injury caused a disabling stroke the next day.  It would eliminate disability retirement for employees who are exposed to something at work that ultimately manifests in cancer.  Indeed, it would eliminate from eligibility for accidental disability retirement all employees who suffer an injury that results in sequelae or a progressive or degenerative condition that is ultimately permanently disabling.  The statute contains no such limitation, and Vest does not suggest that it does.

Conclusion.  Because CRAB articulated no adequate basis for rejecting the DALA magistrate's conclusion with respect to causation or the subsidiary findings discussed above, it should have affirmed that conclusion with respect to causation. Consequently, the judgment of the Superior Court is affirmed.

So ordered.